IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Chastity Leann (Hoke) Hege      :

    Plaintiff                 : (Case No. 3:15-CV-639)

    V.                        :

Carolyn W. Colvin,              : (Judge Richard P. Conaboy)
Acting Commissioner of
Social Security                 :

    Defendant                 :

_____

**Memorandum**

We consider here the appeal of Plaintiff Chastity Hoke Hege
from a decision of the Social Security Administration ("SSA") that
denied her applications for disability insurance benefits ("DIB")
and Supplemental Security Income Benefits ("SSI").  The issues have
been fully briefed by the parties and this matter is ripe for
disposition.

## I.    Procedural Background.

On July 11, 2012, Plaintiff filed applications for DIB and SSI
benefits with the SSA.  Plaintiff alleged an onset date of June 1,
2011 in each instance.  Plaintiff's claims were denied initially on
October 26, 2012.  On December 19, 2013 an evidentiary hearing was
conducted before Administrative Law Judge Randy Riley the ("ALJ").
The ALJ issued an unfavorable decision (Doc. 9-2 at 18-38) on
January 9, 2014, whereupon Plaintiff appealed.  The Appeals Council

1

affirmed the ALJ's decision on February 9, 2015.  (Doc. 9-2 at 2-4).  The Appeal's Council's decision thus became the final decision of the Commissioner of the SSA ("Commissioner").  Plaintiff then filed a Complaint (Doc. 1) in this Court challenging the Commissioner's decision in timely fashion on April 1, 2015.  The Plaintiff and the Commission have briefed their respective positions and this case is ripe for disposition.

## II.   **Testimony Before the ALJ**.

Plaintiff (Hoke) Hege testified as follows: she lives in subsidized housing with her son who is seven years of age.  (Doc. 9-2 at 42).  She was homeless for almost two years between the time she filed her claims and the date of her hearing.  (Doc. 9-2 at 49).  She has received her GED diploma.  (Id.).  She receives temporary cash assistance along with food stamps and medical care.  (Doc. 9-2 at 43).  Plaintiff has never held a driver's license and, at the time of the hearing, she was precluded from applying for one because she had not been seizure-free for a period of six months.  (Doc. 9-2 at 43-44).

With regard to her physical capacities, Plaintiff acknowledged that she can dress herself, attend to her own bathing and hygiene needs, cook, shop, do her own dishes and laundry, vacuum and sweep, and take out the trash.  (Doc. 9-2 at 43).  She participates in social activities such as bowling and being involved in various church groups.  (Doc. 9-2 at 44).  She acknowledged that she can

bend over and touch her toes, and that she can squat down to retrieve an object from the floor and come back to a standing position. (Id.). She stated that she can climb stairs but prefers not to climb ladders. (Id).

Plaintiff testified further that she neither smokes nor drinks and that she has not taken any illegal drugs for three to four years prior to the hearing. (Doc. 9-2 at 45). She stated that she was taking medications to alleviate her seizure disorder and that these medications are sometimes helpful. (Doc. 9-2 at 45-46). Her seizures consist of "staring spells" when she is awake but the seizures more frequently occur while she is sleeping. (Doc. 9-2 at 46). She indicates that she keeps a "seizure log" that indicates that she has been having one to three seizures per month in the year preceding her hearing before the ALJ. (Id.). Plaintiff testified further that she knows when she has had a seizure during sleep because she feels drained and fatigued the next day. (Doc. 9-2 at 46-47). She stated that she would be unable to work a full day on a day following one of her nocturnal seizures. (Doc. 9-2 at 44). She states that she had a waking seizure in March of 2012 that caused her to fall face first into a table and lose her front teeth. (Doc. 9-2 at 48). Plaintiff also noted that when she has one of her "staring spells" she is oblivious to what is happening around her and that these spells seem to occur more frequently when she feels stressed. (Doc. 9-2 at 48-49).

3

With respect to her emotional state, Plaintiff stated that her moods change frequently and that she has "up" and "down" days. (Id). She has trouble motivating herself to do things and has trouble completing tasks that she starts. (Id). She attributes these difficulties to her medications and states that her mind is always racing and that she has trouble keeping herself organized. (Doc. 9-2 at 49-50).

Plaintiff does not believe that she would be able to maintain attention to do a full-time job and stated that she has "a hard enough time" sitting through a movie (Doc. 9-2 at 50). She also states that she finds it stressful being in a busy place around a lot of people. (Id). She stated that at times being around other people makes her so agitated that she begins to curse out loud and that a short time before the hearing she had such an episode while standing in the check-out line at a Walmart store. (Doc. 9-2 at 51).

Finally, Plaintiff stated that being around strong odors, like that of bleach, can give her a headache and that headaches often precede her seizures. (Doc. 9-2 at 52). When she gets a headache, Plaintiff tries to remain in an area with padded surfaces in case she would suffer a seizure and fall. (Id).

Also testifying before the ALJ was Paul Anderson, a vocational expert. Mr. Anderson testified that he was familiar with the SSA definitions of unskilled, skilled, sedentary, light, medium, and

heavy work and that he was familiar with the Dictionary of
Occupational Titles.  (Doc. 9-2 at 53).  Mr. Anderson also stated
that he had reviewed Plaintiff's file and that he was familiar with
her work history.  (Id).

The ALJ posed a hypothetical question to Mr. Anderson that
asked him to assume a person of Plaintiff's age, education, and
work experience who could perform medium work as long as the
workplace did not include fast-paced production quotas and involved
only simple decisions with few, if any, workplace changes.  The
vocational expert was also asked to assume that the work
environment would not include "concentrated exposure to hazards"
and that no interaction with the public and only occasional
interaction with co-workers or supervisors" would be involved.
(Doc. 9-2 at 53-54).  Given these assumptions, the vocational
expert concluded that Plaintiff would be unable to perform any of
her past jobs, but that work existed in the national economy in
significant numbers that she was capable of performing.  (Doc. 9-2
at 54).  These jobs included housekeeper, janitor, and semi-
conductor bonder.  (Id).

When asked whether a need to avoid fumes and chemicals due to
a risk of causing seizures would affect the jobs the vocational
expert identified as being within Plaintiff's capacities, the
vocational expert responded that the exposure to chemicals in the
janitor and housekeeper positions would not be "enough to be

noticed by the Department of Labor data". (Id). When asked what would be the effect on Plaintiff's employability if one assumed she would miss two workdays each month due to seizures or post-seizure symptoms, the VE responded that she would be incapable of competitive employment. (Doc. 9-2 at 55). The VE also testified that, if Plaintiff were unable to maintain socially appropriate behavior for two-thirds of a work day, she would be unemployable.

**III. Medical Evidence.**

    **a.  Dr. Gliebus**

After experiencing seizures on July 4, 2011 while living in a detox center as a result of using various controlled substances, Plaintiff was seen in the emergency room of Chambersburg Hospital and started on Dilantin, and anti-seizure medication. Plaintiff also underwent an EEG study at Chambersburg Hospital which indicated that she was neurologically normal. Upon being released from the detox center, she saw her family physician on July 21, 2011 with complaints of unrelenting headaches. Dr. Heckler, the family physician, referred Plaintiff to Dr. Gediminas Gliebus, a neurologist, who first saw Plaintiff on August 11, 2011.

Dr. Gliebus initially diagnosed Plaintiff with seizures and migraine headaches. Dr. Gliebus noted Plaintiff's past history of migraine headaches and her nine years of opiate addiction. He noted that Plaintiff's seizures were likely secondary to drug withdrawal and that he expected they would last "up to one year".

6

However, notwithstanding his expectations, Dr. Gliebus' office notes of his session with Plaintiff on August 10, 2012 indicated that "she is being followed for complex partial seizures" and that he increased her dosage of Trileptal, an anti-seizure medication, to 600 milligrams twice daily.[1]  On May 15, 2013, Dr. Gliebus again saw Plaintiff and noted at that time that she was still under treatment for "complex partial seizures" and that her dosage of Trileptal had been increased to 900 milligrams twice daily.  Thus, Dr. Gliebus' treatment notes confirm that Plaintiff was experiencing seizures for at least 21 months - - from August 2011 through May, 2013.  See transcript 281-83, 365-69, 529-35, 568-72. Significantly, Dr. Gliebus' notes never address the impact of Plaintiff's seizure disorder on her ability to maintain employment. On November 6, 2013, Plaintiff was seen by Dr. Gliebus' associate, Dr. Stanton Sollenberger, whose notes indicate that Plaintiff continue to have two to three seizures monthly with associated urinary incontinence.  (See Transcript at 685-87).

     b.   Dr. Lee.

     On November 23, 2011, Dr. Leslie Lee of the Pennsylvania Counseling Services provided a psychiatric evaluation of the Plaintiff.  The evaluation was based upon a one hour session with the Plaintiff.  Dr. Lee took Plaintiff's medical and psycho-social

---

[1] Dr. Gliebus' initial diagnosis had been "seizures", but that diagnosis changed to "complex partial seizures" after Plaintiff underwent a 72 hour EEG on July 18, 2011.  See transcript at 404.

history and noted that she had a long history of substance abuse dating back to the age of twelve.   Plaintiff related that she had used many drugs over the years and that her "drug of choice" was oxycodone.   Dr. Lee indicated that Plaintiff's principal complaints were difficulty sleeping and an inability to focus and maintain concentration.   Dr. Lee stated that Plaintiff claimed to be drug free for about six or seven months before the date of their session.   Plaintiff told Dr. Lee about her history of seizures and of her belief that the seizures were stress related.   Dr. Lee's report indicates, however, that she believed, like Plaintiff's neurologist (Dr. Gliebus), that Plaintiff's seizures were secondary to drug withdrawal.   (Doc. 9-7 at 75-76).

Dr. Lee found Plaintiff to be alert, oriented, and articulate. Plaintiff is described as being without hallucinations, delusions, or tangentiality and without any sign of psychosis or mania.   Dr. Lee described Plaintiff, however, as having very limited insight and judgment.   She diagnosed Plaintiff with mental disorders due to previous polysubstance abuse, seizure disorder secondary to drug use, moderate to severe psycho-social distress, and assessed Plaintiff at a global assessment of function (GAF) score of 50. [2]

---

[2] While the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders no longer assesses symptom severity, diagnostic severity, and disability in terms of global assessment of function scores (GAF's), at the time of Plaintiff's assessments, the GAF scale was used to report a clinicians judgment of the patient's overall level of functioning on a scale of 1 to 100.  All of Plaintiff's recorded GAF's that are documented in the record were between 30 and 65. A GAF score of 21-30 indicates that behavior is considerably influenced by delusions or

When Plaintiff was advised that Dr. Lee would not be prescribing any mediation to address her complaints of sleeplessness and inability to concentrate she abruptly left Dr. Lee's office.  (Doc. 9-7 at 76-77).

 c.   Drs. Chakrabarti and Mushtaq.

 Plaintiff was under the care of Dr. Indranil Chakrabarti at Chambersburg Hospital from June 22, 2012 through June 27, 2012. Plaintiff had been admitted after presenting at the Chambersburg Hospital emergency room complaining of depression, suicidal thoughts, and an inability to stop using opiates.  She was initially seen in the ER by Dr. Jameel Mushtaq, who diagnosed bi-polar disorder, anxiety disorder, and opioid dependence in full sustained remission. At admission on June 22, 2012, Dr. Mushtaq assessed a GAF score of 30.  However, by the time patient was discharged on June 27, 2012, Dr. Chakrabarti noted that she "had significant resolution of her mood symptoms" and "was motivated to

---

hallucinations or serious impairment in communication or judgment.  A GAF score of 31-40 indicates some impairment in reality testing or communication and that speech is at times illogical, obscure or irrelevant and may indicate major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  A GAF score of 41-50 indicates serious symptoms such as suicidal ideation, severe obsessional rituals, frequent shoplifting or any impairment in social occupation or school functioning.  A GAF score of 51-60 indicates "moderate symptoms such as flat affect, occasional panic attacks, or moderate difficulty of social, occupational, or school functioning. A GAF score of 61-70 indicates mild symptoms such as depressed mood and mild insomnia or some difficulty in social occupation or school functioning but that the patient is generally functioning pretty well.  See Diagnostic and Statistical Manual of Mental Disorders 34(4th ed., text Rev., 2000). Because the record in this case is generally lacking in any clinician's notes that comment on the Plaintiff's ability to work, the GAF scores, while now not in general use, constitute the best evidence of Plaintiff's level of mental and emotional functioning at various points in time.

be treated as an outpatient." Dr. Chakrabarti noted also that he observed no evidence of bi-polarity and his discharge diagnosis indicated depressive disorder, polysubstance dependence, and borderline personality disorder. Dr. Chakrabarti assigned Plaintiff a GAF score of 60, indicating only moderate impairment, at the time of her discharge. (Doc. 9-8 at 56-78).

Plaintiff did follow through with out-patient treatment after her discharge from Chambersburg Hospital on June 27, 2012. During four subsequent out-patient sessions at the Chambersburg Hospital Behavioral Health Services Clinic that occurred on July 2, July 12, July 24, and August 17, 2012, Plaintiff's GAF scores were assessed, respectively, at 65, 60, 60, and 60.

d. Dr. Moskel.

On October 10, 2012, P. Moskel, M.D., performed a psychological consultation examination of the Plaintiff. As Dr. Lee had done 11 months earlier, Dr. Moskel took a family history and a social history by questioning the Plaintiff. Dr. Moskel's notes demonstrate consistency with the family and social histories Plaintiff had provided to Dr. Lee.

Dr. Moskel described Plaintiff as "a well-developed somewhat overweight female...in no acute distress at the time of examination...". He found that Plaintiff had poor eye contact and that she "appears to be somewhat anxious as well as looking discouraged and depressed." Her thought-processes were seen as

10

logical and rational with no loosening of associations or flight of ideas." Her thought content was described as "within normal limits with nothing to suggest any psychotic or delusional material." She displayed "no obvious obsessive-compulsive features, phobias, or unusual somatic preoccupations." She denied current suicidal ideation. Her attention and concentration were seen as "quite poor". Her immediate memory was somewhat limited and her remote memory was seen as "even more sketchy". Plaintiff's abstract reasoning was described as "grossly intact". Dr. Moskel stated: "Impulse controls are present and she is cooperative throughout the examination." Dr. Moskel estimated Plaintiff's intelligence "as probably somewhere within normal limits."

On the basis of his one session with Plaintiff, Dr. Moskel diagnosed post-traumatic stress disorder, depressed and anxious features and seizure disorder. He assigned Plaintiff a GAF score of 45 on the basis of his one session with her. He found Plaintiff to be significantly impaired in memory and understanding in following even simple instructions. Dr. Moskel also found that Plaintiff's ability to interact with the public and supervisors in a workplace was at least moderately impaired. Dr. Moskel closed by noting that Plaintiff was markedly impaired in her ability to adjust to pressures that could be expected in the workplace due to her problems with concentration and memory. (Doc. 9-8 a 124-130).

e.  Rebecca Newcomer, CRNP

Between January 9, 2013 and November 6, 2013, Plaintiff saw Rebecca Newcomer, a certified registered nurse practitioner, who was "collaborating" with Satyagit Mukherjee, M.D., on at least 11 occasions.[3]  On each of these occasions, Ms. Newcomer's notes indicated that Plaintiff: "Denies agitation, confusion, delusions, hallucinations, homicidal thoughts, loss of interest, obsessive thoughts, compulsive behaviors, racing thoughts, sleep pattern disturbance, and suicidal thoughts.  Denies impulsivity or panic." The assessments of Plaintiff's conditions in Ms. Newcomer's notes indicated "bi-polar disorder, sleep disorder, and anxiety disorder generalized."  On eight occasions between January 23, 2013 and September 12, 2013, Ms. Newcomer assigned Plaintiff GAF scores of 60-65.  On each occasion that Ms. Newcomer saw Plaintiff over the aforementioned ten month period from January to November of 2013, she was described as alert and oriented with clear speech and organized thoughts.  Her anxiety level varied to some extent from visit to visit.  Judgment, attention, concentration, and memory were variously seen as "good", "fair", "intact", or (on March 14, 2013) "mildly impaired".  (Doc. 9-9, 2-19; Doc. 9-10, 50-58).

Ms. Newcomer's notes also indicate on several dates that Plaintiff was stressed and struggling to cope with anxiety related

---

[3] Because the Court cannot gauge the extent of Ms. Newcomer's "collaboration" with Dr. Mukheterjee, Ms. Newcomer's medical opinion will not be treated as that of a medical doctor.

to her son's disabilities.  On December 18, 2013, Ms. Newcomer completed a "Mental Impairment Questionnaire" that was designed to assess the subject's ability to perform various workplace activities.  (Doc. 9-10; 75-79).  Ms. Newcomer indicated that Plaintiff had mild to moderate limitations in most areas related to her ability to function in the workplace.  Plaintiff was seen to have marked limitations only with respect with her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) set realistic goals or make plans independent of others; (4) deal with the stress of semi-skilled and skilled work; (5) interact appropriately with the general public; and (6) maintain socially appropriate behavior." [4]

## IV.   ALJ Decision.

The ALJ's decision (Doc. 9-2 at 18-38) was unfavorable to the Plaintiff.  It includes the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.   The claimant has not engaged in substantial gainful

---

[4] In the context of the Mental Impairment Questionnaire, "mild limitation" indicates that the subject "can generally function well", "moderate limitation" indicates that the subject is still able to function satisfactorily; and "marked limitation" indicates that the subject "is severely limited but not precluded from doing work-related activities on a day-to-day basis in a regular work setting". (Doc. 9-10 at 75).

activity since June 1,2011, her alleged onset date
(20 CFR 404.1571 et seq and 461.971 et seq).

3. The claimant has the following severe impairments:
Obesity, bipolar disorder, and post-traumatic stress
disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or
combination of impairments that meets or medically
equals the severity of one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525, 404.1526, 416.920(b), 416.925
and 416.926).

5. After careful consideration of the entire record,
the undesigned finds that the claimant has the
residual functional capacity to perform medium work
as defined in 20 CFR 404.1567(c) and 416.967(c).
The claimant in unable to climb ladders.  The
claimant should avoid concentrated exposure to
hazards.  The claimant is limited to performing work
involving only simple, routine, repetitive tasks in
a work environment free from fast-paced production
and involving only simple work-related decisions
with few if any workplace changes, no interaction
with the public, occasional interaction with co-
workers, but no tandem tasks and occasional

14

supervision.

6.   The claimant in unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on December 21, 1983 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because Medical Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2011, through the date of this decision (20 CFR

404.1520(g) and 416.920(g)).

## V. Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[5]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of

---

[5] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.19).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make

17

clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not

18

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See, e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the

court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

**A. General Considerations**

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here,

20

we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.    Plaintiff's Allegations of Error.**

**1.    Whether the ALJ's Determination that Plaintiff's Seizure Disorder did not Constitute a "Severe Impairment" at Step 2 of the Sequential Evaluation Process was Error?**

Plaintiff argues that the ALJ's conclusion that her seizure disorder was non-severe at Step 2 of the evaluative process was error. (Doc. 10 at 20). This argument would be persuasive if the

ALJ had ended his evaluation at Step 2.  However, that was not the case.  The ALJ found at Step 2 that Plaintiff had multiple severe impairments including obesity, bi-polar disorder, and post-traumatic stress disorder as well as a non-severe seizure disorder. Step 2 of the Commissioner's five step sequential evaluation process "is a threshold analysis that requires (the claimant) to show that he has one severe impairment."  Bradley v. Barnhart, 178 F.App'x 87, 90 (7th Cir. 2006); See also DeSando v. Astrue, 2009 WL 890940 (M.D. Pa. March 31, 2009).  Because the ALJ found that Plaintiff had multiple severe impairments, his determination that Plaintiff's seizure disorder was "not severe" is no more than harmless error at Step 2 and irrelevant.  See Salles v. Commissioner of Social Security, 229 F.App'x 140, 145n2 (3d. Cir. 2007).  So long as a claim is not denied at Step 2 and the ALJ accounts for all impairments, severe and non-severe, in assessing Plaintiff's residual functional capacity, it is insignificant if the ALJ does not find any particular impairment to be severe. Bliss v. Astrue, 2009 WL 413757 at 1n.1 (W.D.Pa. February 18, 2009).

In characterizing Plaintiff's seizure disorder as "non-severe", the ALJ noted that various EEG's, including one lasting 72 hours, did not confirm a diagnosis of seizure disorder and that Dr. Gliebus, her treating neurologist, repeatedly found that Plaintiff was "neurologically stable".  (Doc. 9-2 at 31). Nevertheless, in

22

his hypothetical question to the vocational expert, the ALJ made reasonable accommodations for the symptoms Plaintiff alleges she experiences as a result of her seizures.  The ALJ allowed for Plaintiff's seizure disorder by limiting her work to jobs in which she would have no concentrated exposure to hazards and would perform only simple, routine, and repetitive tasks in a work environment free from fast-paced production pressures. Accordingly, this Court finds that the ALJ's assessment of Plaintiff's residual functional capacity reflected all Plaintiff's impairments, severe and non-severe.  More than that is not required.  See Richards v. Astrue, 2010 WL2606523 at 5 (W.D. June 28, 2010)(citing Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987)).  Accordingly, the ALJ's conclusion that Plaintiff's seizure disorder was "non-severe" at Step 2 of the evaluative process cannot constitute error because this case was ultimately evaluated appropriately through Step 5 of the process the Commissioner must observe.

**2.    Whether the ALJ Erred by Failing to Award a Closed Period of Disability from June 1, 2011 through June 27, 2012?**

Plaintiff argues that the record conclusively supports that she suffered such severe impairment of her mental health in the period from June 1, 2011 through June 27, 2012 that the ALJ erred by failing to award a closed period of disability for that time

23

period.  (Doc. 10 at 21-22).  As Plaintiff points out, the period from June 1, 2011 through June 27, 2012 constitutes more than the twelve-month period required for a disability claim to be established.  Plaintiff fails to note, however, that the twelve-month period prescribed by 42 U.S.C. § 432(d)(1)(A) must be characterized by continuous disability.  In this case, the record Plaintiff has created establishes, at most, that she was sporadically disabled in that time period.  While there is documentation that she was functioning, as measured by several GAF scores, at a seriously impaired level in terms of her social and occupational abilities during the relevant time period, there is no cogent medical opinion establishing a continuous severe impairment for at least twelve months as required under the Social Security regulations.  Also, Plaintiff's GAF scores as measured on other occasions (GAF of 55 on August 22, 2011 and GAF of 60 on June 27, 2012) in the relevant time period indicate only moderate, non-disabling mental impairment.  Thus, based upon the record before this Court, the ALJ's decision to reject Plaintiff's claim for a closed period of disability may not be faulted.

    **3.    Whether the ALJ Erred in Subordinating the Opinions of Drs. Moskel and Lee to that of Rebecca Newcomer, CRNP?**

Plaintiff asserts that the ALJ impermissibly elevated the medical opinion of Rebecca Newcomer, a certified registered nurse practitioner, over those of two consulting physicians, Dr. P.

Moskel, and Dr. Leslie Lee.  (Doc. 10 at 22-25).  Plaintiff correctly states that, as a registered nurse practitioner, Ms. Newcomer is not considered an "acceptable medical source". Nevertheless, Ms. Newcomer's evaluations of Plaintiff's mental condition were derived from eleven different sessions with Plaintiff over a ten month period.  During that time, in collaboration with Dr. Mukherjee, Ms. Newcomer repeatedly found that, while Plaintiff was undeniably suffering from stress-related difficulties, her judgment, concentration, attention and memory were generally "fair" to "good" and, on one occasion, "mildly impaired".  See Page 12 ante.  Ms. Newcomber was also the only health care professional to complete a "Mental Impairment Questionnaire" and this record is devoid of any employability assessment form or medical source statement from any physician. Ms. Newcomer's impression of Plaintiff as expressed on the "Mental Impairment Questionnaire" indicated only moderate, non-disabling impairments in any of the abilities and aptitudes needed to perform unskilled work.  See Document 9-10 at 76.

While Drs. Moskel and Lee may have more impressive credentials than Ms. Newcomer, they each saw Plaintiff on only one occasion and evaluated her situation based solely upon the oral history Plaintiff provided.  They did not have the benefit of repeated encounters with Plaintiff over a protracted period of time as did Ms. Newcomer.  And, while Ms. Newcomer is not an "accepted medical

source", she is still a "medical source" who, by definition, may be given more weight than an "acceptable medical source" if she, as is the case here, has seen the Plaintiff more often and provided a clear explanation of her thought process in reaching her conclusions.  See SSR 06-03p.  As Defendant correctly points out in its brief (Doc. 11 at 21), according more weight to a medical source who is not "an acceptable medical source" over that of an "acceptable medical source" may be appropriate even where the "acceptable medical source" is a treating physician, and neither Dr. Moskel nor Dr. Lee may be appropriately classified as treating physicians in this case.  Their consultative reports, both of which resulted from one session with the Plaintiff, are at best only snapshots of Plaintiff's mental condition at specific moments and do not provide substantial evidence that she was disabled for a continuous period of 12 months or more as required by the Social Security Act.  In light of Ms. Newcomer's much more extensive relationship with Plaintiff, the Court cannot conclude that the ALJ erred in basing his decision upon Ms. Newcomer's numerous evaluations of the Plaintiff over a protracted period of time.

**VIII.   Conclusion.**

For the reasons stated above, the Court finds that the Commissioners's decision was supported by the requisite substantial evidence and the Commissioner's decision to deny benefits in this case will be affirmed.  An Order to that effect will be filed contemporaneously.


**BY THE COURT**

                                        S/Richard P. Conaboy
                                        Honorable Richard P. Conaboy
                                        United States District Court


Dated: October 15, 2015

27